DOMZALSKI *v.* JOZEFIAK.

1. EVIDENCE—OPINION EVIDENCE—HANDWRITING EXPERTS—EXPERT
   TESTIMONY—FORGERY.

   In suit to have certain instruments declared void on ground that
   signatures thereto are forgeries, opinion evidence as to genuine-
   ness of signatures was properly received; its weight being for
   trier of facts.

2. CANCELLATION OF INSTRUMENTS—FORGERY—OPINION EVIDENCE—
   APPEAL AND ERROR.

   Decree of trial court setting aside certain instruments as for-
   geries is not disturbed, on appeal, in view of fact that strong
   case was made for plaintiff by handwriting experts, that there
   were certain improbabilities in defendants' case, and that trial
   judge had advantage of seeing and hearing witnesses.

Appeal from Wayne; Brennan (Vincent M.), J.
Submitted January 22, 1932. (Docket No. 78, Cal-
endar No. 35,363.) Decided March 2, 1932. Rehear-
ing denied June 6, 1932.

Bill by Casimir A. Domzalski, as guardian of his
two minor children, against John A. Jozefiak and
others to declare certain deeds and other instru-
ments void because of forgery, for an accounting,
and other relief. Decree for plaintiff. Defendants
appeal. Affirmed.

*Harry J. Lippman* and *Stanley J. Domzalski*
(*Leslie D. Bloom,* of counsel), for plaintiff.

*Charles P. O'Neil,* for defendants.

CLARK, C. J. The issue presented by the bill and
answer for decision in the trial court was whether
four deeds, a bill of sale, and a bank withdrawal

On value and weight of expert testimony as to handwriting, see
annotation in 62 L. R. A. 871; 64 L. R. A. 317; L. R. A. 1918D, 642.

slip, purporting to have been signed by Mary Jozefiak, are genuine or forgeries. The decision of the trial judge is that they are forgeries. He filed an opinion, excellently reasoned and prepared, reviewing the testimony—2,300 pages, and hundreds of exhibits, which has been helpful, as we gratefully acknowledge. Plaintiff had decree accordingly. Defendants have appealed.

Mrs. Jozefiak, a widow, conducted successfully a retail dry goods business in Detroit and accumulated a considerable fortune. She was mother of five children, John, Marie, Michael, Josephine, and Theresa. Theresa married plaintiff and died in 1924, leaving two children of the marriage whom plaintiff represents here as guardian. The defendants are remaining children above named. Mrs. Jozefiak, aged 60 years, in good health and active in her business, became ill February 24, 1928, and died four days later.

The bill of sale is dated July 20, 1927. The name Mary Jozefiak appears on the face of it and to the affidavit on the back of it. The notary was Anthony J. Cass, a constable; the witnesses, Frank J. Wilkowski and Joseph Nowakowski. It purports to convey the stock and fixtures of the dry goods business to John and Josephine.

The four deeds are dated August 11, 1927. The name Mary Jozefiak appears in usual place on each deed; witnesses and notary same as on bill of sale. The deeds purport to convey real estate of Mrs. Jozefiak to the four defendants.

The last document is a Peninsular State Bank withdrawal slip, dated February 27, 1928, acknowledging receipt of savings account and bearing the name of Mary Jozefiak.

Defendants had testimony that bill of sale was delivered when made, that deeds were held by No-

wakowski, brother of Mrs. Jozefiak, as directed, and delivered after her death. The notary, the subscribing witnesses, and some of the defendants testified that Mrs. Jozefiak signed the deeds and the bill of sale.

There is flat contradiction between employee of the bank and Josephine as to preparation of withdrawal slip, but there is testimony that Mrs. Jozefiak signed it, either in blank or after it had been prepared at the bank.

Mrs. Jozefiak disliked, hated the plaintiff. This was not a delusion. Although she was opposed in her wish to see plaintiff's children and rebuffed in her efforts to be kind to them, she yearned for them, did not forget they were the children of her Theresa.

Mrs. Jozefiak's attorney was Peter J. Monaghan. She went to his office in January, 1926, and either he or his associate, Mr. Kellogg, prepared a will for her, which, however, she did not sign. It proposed to give to each of her said grandchildren $1,000 in trust, cash bequests to John and Josephine, residue to her four surviving children.

The bill of sale and the four deeds were typewritten, including dates. Although attention of defendants was challenged by the court during the hearing, the record is silent as to when and by whom they were typewritten. They were not prepared by or at direction of Mr. Monaghan. Defendants had testimony that the writings were produced by Mrs. Jozefiak when the notary and witnesses arrived at her store, where, it is contended, they were executed.

Michael, among his activities, conducted a "saloon" in Detroit. Wilkowski was his friend and patron. Cass, as stated by the trial judge, was a crony of Michael. Nowakowski was his uncle. In each instance, when it is contended the papers were executed by Mrs. Jozefiak, Michael, it is said, col-

lected the witnesses and notary in his car and drove to the store.

Most of defendants' testimony was brought out on examination of witnesses called under statute for cross-examination by plaintiff.

Plaintiff's case is opinion evidence of handwriting experts on comparison of signatures, aided by many enlarged photostatic copies, plus claimed contradictions, inconsistencies, and improbabilities in defendants' case.

The record as to handwriting is most unusual. Plaintiff called as experts George W. Wood, Francis B. Courtney, and William C. Henning. Standards, genuine signatures, were set up and compared with the questioned signatures. Hundreds of pages of record show the matter explored to the last fragment, and the opinion of the witnesses was, without reservation, that the signatures were forgeries. Defendants, attempting expert testimony, called two witnesses, and were not aided thereby; in fact, the witnesses were helpful to plaintiff. The case was about to close when the trial judge took a hand. He called Frederick F. Corley, associated with a bank in Detroit, whose duty was to pass upon signatures in connection with the main office of the bank, and he had been so employed for nearly 19 years. He knew none of the parties and nothing of the litigation. Documents bearing the questioned signatures and many other documents bearing genuine signatures had been placed in slotted numbered envelopes so that only the signatures could be seen. After the witness had examined genuine signatures, the court said to him:

"I would like to have you examine these in the envelopes and tell me whether they are all genuine, whether they are all forgeries, or whether some of

them are genuine and some forgeries. Treat each signature the same as you would a check coming into the bank, would you pay money on it or would you not? Now, I will have you go in with Mr. Williams, you can bring the witness into my office and he can look these over while he is in there."

And later:

"*The Court:* Now, Mr. Corley, you have had these checks and other signatures in your possession for about three quarters of an hour this afternoon, and as I recall it, about an hour this morning. So we will say between an hour and an hour and a half, and two hours, you have had the opportunity to examine them and compare various signatures one with another, is that correct?

"*A.* Yes, sir.

"*Q.* Speak out loud, please, so everybody will hear you.

"*A.* Yes, sir.

"*Q.* And I will ask you whether or not you have come to any conclusion as to which of the signatures are genuine, and which of the signatures in the envelopes, whether they are all genuine, whether or not some are genuine and some are forgeries, or whether they are all forgeries. Have you reached any opinion?

"*A.* Yes, I have.

"*Q.* All right, what is that opinion?

"*A.* I find six of them that apparently seem to be written by the different hand.

"*Q.* All right, which six are they, give me the envelope numbers?

"*A.* There is 318, 319, 321, 322, 323, and 329."

The envelopes so numbered contained the bill of sale, the four deeds, and the withdrawal slip. After much examination by counsel on both sides, this witness remained of the opinion that the questioned signatures were not genuine.

The trial judge thereupon called Isadore J. Wierzbicki, the employee of the Peninsular State Bank who had paid on the withdrawal slip and who testified that he prepared it for signature and who was familiar with Mrs. Jozefiak's signature, having observed thousands of her checks. This witness was given seven of the slotted envelopes showing only the signatures of the inclosed concealed documents. He pronounced four genuine, which were unquestionably so, and three spurious, the three being three of the questioned documents, among them the very withdrawal slip upon which the witness had paid a large sum of money at the bank. The exhibits viewed by the trial court are before this court.

There are some inconsistencies or contradictions in testimony of defendants' witnesses. They are not very significant. It would be more significant had they all told exactly the same story. There are two infirmities in the defense of which we speak.

It is contended that what was done is precisely what Mrs. Jozefiak wanted done. If Mrs. Jozefiak signed the questioned documents, she passed Theresa's children without even mention or remembrance. She was determined to exclude plaintiff, no doubt of it. She proposed to provide for the children in the will she caused to be drawn. We cannot find on this record that she wished Theresa's children so ignored. If the deeds and bill of sale are genuine, then, on this record, Mrs. Jozefiak herself caused them to be drawn and typewritten. If so, why did she not sign them when and where they were prepared? She had consulted Mr. Monaghan a number of times. He was her attorney. She was active and able to go where she pleased. Why should this most important matter, by which nearly all of her property was to pass, have been attended to by a constable in a back room of the store rather

than by her trusted attorney? Who prepared the deeds and bill of sale? Not Mr. Monaghan. Otherwise the record is significantly silent. Why were they dated by typewriting?

A case of opinion evidence on handwriting stronger than that made here in behalf of plaintiff cannot well be imagined. Many authorities regard such evidence as of doubtful value. Some have characterized it as of the lowest order, a necessary evil, and the like. *Matter of Alfred Foster's Will,* 34 Mich. 21; 22 C. J. p. 787. At the other extreme is *Boyd* v. *Gosser,* 78 Fla. 70 (82 South 758, 6 A. L. R. 500), where it was held to be "within the field of demonstrative evidence." But all agree that it is evidence, the weight of which is for the trier of the facts. We quote from note 6 A. L. R. 508:

"There is not, and necessarily cannot be, any rule of decision on the point. Theoretically, of course, facts cannot lie, while eyewitnesses may be perjured, or honestly mistaken, in saying that they saw the disputed document written or signed by the person whose act it purports to be. But in order that facts may not mislead, their significance must be understood, and this significance may be appreciated only under the tuition of specialists. Hence the admissibility of expert testimony, the function of the expert being not to resolve an issue for the decision of which the trier of the fact has not the necessary training, but to supply the vicarious experience which will enable the trier to reach a correct conclusion. Such being the function of the expert, it is obvious that the aid which he may afford is a variable quantity, according to the extent of his perception of the various factors entering into the problem, and the correctness of his appreciation of their significance. In view of the fact that some of these factors, in the case of handwriting, must remain to a great extent unknown, such as the condition of the

writer's health, or the emotions under the influence of which he may have been at the time, the dubitancy with which the reasoning of handwriting experts is ordinarily followed is justifiable. No problem can be solved with mathematical certainty where some of its factors must remain imperfectly known. * * *

"Hence there is, and can be, no rule that the conclusion which the data supplied by the expert tend to establish is to be preferred to the conclusion to which other evidence in the case points, or *vice versa.*"

Upon a review of all the evidence, as above outlined, we are not moved to disturb the decision of the trial judge, who saw all the witnesses and heard them patiently for many weeks.

Affirmed. Costs to plaintiff.

McDonald, Potter, Sharpe, North, Fead, Wiest, and Butzel, JJ., concurred.